NETHERLANDS SHIPMORTGAGE
CORPORATION, LTD., Plaintiff,

v.

Mark MADIAS and Nicholas T.K.
Skarvelis, Defendants.

NETHERLANDS SHIPMORTGAGE
CORPORATION, LTD., Plaintiff,

v.

Mark MADIAS, Irene Madias, Nicholas
T.K. Skarvelis, Maria Skarvelis and
Real Associates, Defendants.

Nos. 82 Civ. 6378–CSH, 82 Civ. 588–CSH.

United States District Court,
S.D. New York.

Jan. 13, 1983.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiff; Rob-

ert L. Sills, Blake Perkins, New York City, of counsel.

Golenbock & Barell, Redfield & Georgiopoulos, New York City, for defendants; Stephen M. Rathkopf, Harold M. Hoffman, Constantine P. Georgiopoulos, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge (orally): *

The case is before the Court on plaintiff's motion for a preliminary injunction which would restrain certain individuals and a corporation from dealing in any way with certain specified real estate in this state. In order to set forth the reasons for the Court's ruling, it is necessary to go into some detail with respect to the background of the litigation which brings us here.

The injunctive relief is sought in 82 Civil 8588 which is brought by the plaintiff Netherlands Shipmortgage Corporation, Ltd. against the following defendants: Mark Madias, Irene Madias his wife, Nicholas T.K. Skarvelis, Maria Skarvelis his wife, and an entity known as Real Associates.

That action, however, was preceded by another action in this Court which bears docket number 82 Civil 6378. In that action Netherlands Shipmortgage Corporation, Ltd. also appears as plaintiff. The individual defendants and the only defendants are Mark Madias and Nicholas Skarvelis. I will deal first with that action.

The plaintiff is a Bermuda corporation. It made a loan of $1,550,000 to Phoenix, Incorporated, a Liberian corporation. Phoenix used the proceeds of that loan to purchase an oceangoing vessel called the NAGOS, of Liberian flag. In connection with the loan the plaintiff obtained a promissory note of Phoenix, a loan agreement from Phoenix, a preferred mortgage on the vessel herself, assignments of charter hire and other earnings of the vessel and a personal guaranty executed by defendants Mark Madias and Nicholas Skarvelis.

---

* The text of this opinion was delivered orally at a hearing on December 30, 1982. The footnotes were added thereafter.

It appears from the record before me that Phoenix has defaulted in various respects under the loan agreement, at least the plaintiff alleges it has done so. The NAGOS was arrested in Curacao to enforce the preferred ship mortgage and the individual defendants referred to have been sued here on their guaranty. It is that suit on the guaranty initiated by plaintiff and against those defendants which forms the subject matter of 82 Civil 6378. The individual defendants are residents of New York State.

The second action, 82 Civil 8588, came into being when counsel for the plaintiff, concerned about the good faith of the defendants in the first action, conducted searches of various county clerk offices in the state and there discovered that in October of 1982 a significant piece of real estate had been conveyed by the defendants to their wives without consideration. This was real property which had been listed by the individual defendants in certain schedules which were presented to the plaintiff in respect of the efforts to obtain the loan.

Because I regarded these transactions as prima facie evidence of fraud, a temporary restraining order was issued on December 23, 1982, and a hearing was ordered. The hearing took place yesterday. The hearing which took place yesterday addressed a series of questions, but the questions considered all relate to a single issue, and that is whether or not the plaintiff has proper standing to invoke the assistance of this Court.

Alternative grounds are asserted by the plaintiff at least in respect of 82 Civil 6378. The plaintiff contends within the context of that suit, which I consider I must take into account for reasons that will become apparent later on, that it has two alternative sources of standing:

One is admiralty jurisdiction as particularly conferred upon this Court by the Ship Mortgage Act of 1920 as amended to include foreign ship mortgages in 1954.[1] The second alternative ground of jurisdiction and standing is diversity of citizenship.

■ The central issue which was addressed yesterday is whether or not Section 1312 of the Business Corporation Law of New York State operates to bar plaintiff from bringing this action.[2]

Section 1312 applies to foreign corporations who are doing business in New York State. It does not apply to foreign corporations who are not doing business in New York State. Consequently, significant parts of the evidence adduced yesterday focused upon the question of whether or not this plaintiff, Netherlands Shipmortgage Corporation, Ltd. of Bermuda was doing business within New York State.

I do not think, with due respect to counsel, that it can seriously be contended that the plaintiff is not doing business in New York State. What the plaintiff does is to solicit, and if the solicitations are successful, consummate loans on vessels.

A schedule was received in evidence yesterday which listed some 18 consummated transactions. During the course of the testimony two additional consummated loans surfaced. One of those two is the transaction underlying this litigation which does not appear in the schedule, Plaintiff's Exhibit 1. The other is a transaction which was consummated in September of 1982.

Of those 20 consummated transactions, 19 of them were partially closed in New York. By "partially closed" I mean this:

The closing with all of the papers generated by such a transaction was coordinated in New York by counsel to the plaintiff.

1. 46 U.S.C. § 911 et seq. (1975).

2. Section 1312 of the New York Business Corporation Law, 6 McKinney's Consol.L.N.Y. (1963) provides in pertinent part as follows: "(a) A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation."

That is the firm of Burlingham, Underwood & Lord.

It is true that in respect of these transactions other geographical areas and countries were involved in the closing. At least that is true in respect of some of them. Where other geographical areas and countries become concerned, it is because in order to perfect the ship mortgage under the statute, documents must be registered with the country of the vessel's flag. In consequence, we see closings which take place partially in New York and partially in Panama or in Piraeus or in the Cayman Islands or in Mexico City. This results from the fact that the vessels in question in respect of which the loan was being issued flew the flags of those countries and it was necessary for the reason I have stated for certain documents to be filed in those countries in order to complete the closing and perfect the mortgage. But 19 out of 20 of the plaintiff's transactions were coordinated, orchestrated and put together by counsel for the plaintiff here in New York.

In respect of most of those closings, the plaintiff's president and chief operating officer, Mr. Vriesendorp, who gave evidence before me, came to New York for the purpose of executing documents which were necessary in order to consummate the loan.

These are not the only missions which have brought Mr. Vriesendorp to New York on a regular and recurring basis since the plaintiff was formed in January of 1979. He has also come to New York in order to solicit business from such brokers as Mr. Mukaida's employer, another witness who testified before me yesterday.

It is apparent, for example, that while Mr. Vriesendorp and other representatives of the plaintiff were staying at a New York hotel, they affirmatively responded to an advertisement which Mr. Mukaida's company had placed in the press and as a result of that response negotiations transpired between the plaintiff and Mr. Mukaida's company which led to a series of consummated loan transactions, six in number, together with additional outstanding commitment letters.

Mr. Mukaida's company is called Interlink Agencies. They are brokers concerned in arranging financings on behalf of shipowners.

In addition to these contacts in New York with companies such as Mr. Mukaida's, Mr. Vriesendorp maintains contacts with past and prospective borrowers. He comes to New York on a regular and recurrent basis, he performs functions in New York which are essential to the business in which his company is engaged. When on rare occasions Mr. Vriesendorp was not present in New York himself to attend to a closing, the Burlingham firm was given the power of attorney to execute the necessary documents and acted as attorney in fact.

It is said on behalf of the plaintiff that New York is the capital of the ship financing world and that to engage in a series of such transactions it is necessary to come to New York where expert admiralty counsel such as the Burlingham firm exist and are in a position to render services on a regular basis.

This is entirely true. New York is the capital of the financial world in shipping, or at least certainly one of the capitals. The Burlingham firm is an excellent firm. I could suggest the names of others at least as well qualified, perhaps, but it is true as a practical matter that companies such as the plaintiff inevitably find themselves in New York. But that does not demonstrate that they are not doing business in New York, it simply shows why as a practical matter it is necessary for them to do business in New York; and that the plaintiff was doing business in New York within the meaning of Section 1312 the evidence really leaves no doubt whatsoever. In consequence, other questions arise.

Since the plaintiff is doing business in New York, as I have found on the evidence, the question that arises is whether Section 1312 of the Business Corporation Law, which by its terms would seem to apply, does not apply. Is there some other reason which exists outside of the wording of Section 1312 itself which renders that section inapplicable?

The plaintiff offers a number of reasons why this conclusion should be reached. The first is that this is a suit within the Court's admiralty jurisdiction as conferred by the Ship Mortgage Act.

It is important to qualify the phrase "admiralty jurisdiction" by the following phrase I have just used: "as conferred by the Ship Mortgage Act." That is so because prior to the enactment of the statute it was quite clear that a mortgage on a vessel was not within the admiralty and maritime jurisdiction.[3] In that regard it may be contrasted with a contract of charter party or a contract for security in general average, more commonly referred to as a general average bond. These are contracts which always were regarded as within the admiralty and maritime jurisdiction. A ship mortgage was not so regarded at common law.

The Ship Mortgage Act, first passed in 1920, was intended to encourage private investment in shipping by making available to lenders the process and jurisdiction of the admiralty court, not only in rem but in personam.[4] As I have said, in 1954 the statute was amended so as to extend the admiralty jurisdiction of this Court and processes in rem and in personam to foreign ship mortgages, assuming that certain requisite formalities had been complied with.

■ The point, however, is that the Ship Mortgage Act is in derogation of the common law. It creates an admiralty remedy which had not existed before, and at least in jurisdictional terms it is my view that the statute must be construed strictly in accordance with its own terms.

■ The federal courts are courts of limited, not general, jurisdiction. That, I think, is a principle which always must be kept in mind. Unlike states courts of general jurisdiction, federal courts have jurisdiction only if it is derived from the Constitution or from a specific act of Congress.

■ The specific act of Congress in this case is, as I have said, the Ship Mortgage Act. The section upon which the plaintiff must necessarily depend appears in 46 U.S.C. § 954(a). That section provides as follows:

"Upon the default of any term or condition of a preferred mortgage upon a vessel, the mortgagee may, in addition to all other remedies granted by this chapter, bring suit in personam in admiralty in a district court of the United States against the mortgagor for the amount of the outstanding mortgage indebtedness secured by such vessel or any deficiency in the full payment thereof."

The operative phrase is "against the mortgagor." That remedy in derogation of the common law the Ship Mortgage Act gives to lenders. It gives lenders no further or different remedy. Plaintiff in this case seeks to sue not the mortgagor, but the guarantor of the loan arrangements. The mortgagor is Phoenix. Phoenix is not the defendant; individual guarantors are the defendants.

I find no authority in the statute or its legislative history or in case law to which I have been cited or in case law which my own research reveals which would extend the remedies of the Ship Mortgage Act to a guarantor.[5] The suit lies against a different party. It is founded upon an entirely different contract.

Some ship mortgages are accompanied by guaranties, perhaps the majority of them are, but they do not need to be. A lender,

---

3. *Bogart v. The Steamboat John Jay,* 17 How. 399, 58 U.S. 399, 15 L.Ed. 95 (1854).

4. *Chemical Bank New York Trust Co. v. Steamship Westhampton,* 358 F.2d 574, 580 (4th Cir. 1965), *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966).

5. The question appears to be one of first impression. *Reedsburg Bank v. Apollo,* 508 F.2d 995 (7th Cir.1975), upon which defendants rely, is not squarely in point. The case holds that the personal guarantors of a preferred ship mortgage were not entitled to intervene in the in rem proceeding initiated against the vessel by the mortgagee, pursuant to 46 U.S.C. § 951. The mortgagee did not elect to commence an action in personam under 46 U.S.C. § 954(a), and so the scope of the remedy afforded under that section was not presented for decision.

if he wishes, may rest content with the mortgage upon the vessel, the promissory note issued by the borrower (the mortgagor) and the assignment of freights or charter hire. It is not necessary or essential to the viability of a ship mortgage, domestic or foreign, under the statute to have it accompanied by a guaranty. The guaranty is a separable and separate contract and I see nothing in the authorities to permit a suit against the guarantor to be brought within the Ship Mortgage Act. The plaintiff cites me to no such authority.

Reliance is had upon admiralty actions against the guarantors of charter parties[6] or against the issuers of general average bonds.[7] But for the reasons already stated, those cases are entirely inapposite. One who guarantees the performance of a contract recognized as maritime under the general maritime law and always so recognized may fairly be said to have taken upon himself an obligation cognizable in the admiralty. In my view, that simply does not apply to the task of statutory construction which falls upon me insofar as the plaintiff seeks to invoke the provisions of the Ship Mortgage Act.

I hold that the provisions of that statute are not available to this plaintiff in this suit against these defendants.

■ The next basis for avoiding the effect of Section 1312 is that the plaintiff should be regarded as a bank.

I should have said, if I did not say earlier, that it is undisputed that this plaintiff has not registered in New York and is not authorized to do business in New York. That is why we are dealing with these particular questions.

Should the plaintiff be regarded as a bank? That question is of significance, because New York law exempts from the operations of the Business Corporation Law, including Section 1312, those entities which may be regarded as banks. The par-

ticular provision which brings about that result is contained in the Banking Law itself. Section 1002, subdivision 2, of the Banking Law of the State of New York[8] provides:

"The General Corporation Law, the Stock Corporation Law and the Business Corporation Law shall not apply to any corporation or foreign corporation as defined in Section 1001."

When we look back to Section 1001, we find that "corporation" is defined in subsection 1 of that paragraph as follows:

"Corporation means and includes all banks, trust companies, industrial banks, safe deposit companies, investment companies and mutual trust investment companies."

With respect to what a bank is within the context of New York law, the closest and most pertinent provisions appear to be these. Section 2 of the Banking Law in subdivision 1 says this:

"The term 'bank' when used in this chapter, unless a different meaning appears from the context, means any corporation other than a trust company organized under or subject to the provisions of Article 3 of this chapter."

If we then turn to Article 3 of the Banking Law, we can perceive, it seems to me fair to say, at least some notion of what the New York Banking Law means by a bank.

The general powers of banks and trust companies are set forth in Section 96 of the Banking Law and they set forth, as one would expect, a detailed description of the sorts of things that banks do; safe deposit boxes, selling, exchange or bullion, discounting, purchasing, negotiating promissory notes, drafts, bills of exchange, et cetera, renting vaults, safe deposit boxes and what have you.

That I think it fair to say is what the broad outlines of New York law mean by a

6. *Japan Line Ltd. v. Willco Oil Ltd.,* 424 F.Supp. 1092 (D.Conn.1976); *Eagle Transport, Ltd. v. O'Connor,* 449 F.Supp. 58 (S.D.N.Y. 1978).

7. *Compagnie Francaise de Navigation a Vapeur v. Bonnasse,* 19 F.2d 777 (2d Cir.1927).

8. 4 McKinney's Consol.L.N.Y. (1971).

bank. Certainly that is the sort of institution that was involved in the case that the plaintiff cites to me on the interreaction of banking corporations with Section 1312 of the Business Corporation Law. That case is *Commonwealth Bank & Trust Company v. Tioga Mills, Incorporated,*[9] and there appears to be no question that the plaintiff, as its name would suggest, was a banking corporation whose activities parallel those activities which one customarily thinks of in connection with a bank.

I will revert to certain questions under New York law in a moment.

Reference has also been made on the argument to the law of Bermuda, and it is appropriate to consider the law of Bermuda because this plaintiff is a Bermudian corporation.

Without dealing at least for the moment with whatever choice of law questions may arise as to the law one should examine for the definition of a bank and whether or not the plaintiff is a bank, I will consider the law of Bermuda on the question.

I have heard a considerable amount of evidence which I feel I can credit on that point. Exhibits are in evidence. Mr. Vriesendorp is experienced in the law and the commercial practices of Bermuda and I have found his testimony illuminating on certain points.

Bermuda is a small, lovely, usually tranquil, occasionally troubled, island. It is one of the islands in this part of the world which have suggested themselves to European and American companies as possibly advantageous places in which to do business, either because of a perceived tax advantage or some other advantage. It seems to me that I may take judicial notice of that fact. If I may not, I find sufficient basis in Mr. Vriesendorp's testimony for what I have just said. It is not just lenders of money like his company who have come to Bermuda; so have marine insurance companies from continental countries. It is the concept referred to in the vernacular as "moving offshore."

In using that phrase I do not do so in any pejorative sense, quite the contrary, but one must recognize that this is a course of conduct which has commended itself as advantageous to a number of different companies pursuing a number of different interests and commercial objectives. To the island of Bermuda a number of such foreign companies come. I use the phrase "foreign company" to mean a non-Bermudian.

It is apparent to me from the record that Bermuda has taken certain steps to control and to regulate this phenomenon, steps which it seems to me are intended to preserve the commercial stability if not the fragility of the island.

As far as banks and banking in Bermuda are concerned, I find on the evidence before me that there are only four banks in Bermuda, at least as that word is usually used and understood. These are the Bank of Bermuda, Butterfield's Bank and two other banks which Mr. Vriesendorp referred to in his evidence yesterday. No one else in Bermuda, I find from the evidence, can act like a bank at least in the manner that those banks act. Indeed, the plaintiff cannot even call itself a bank under Bermuda law and it is not entitled to act as a bank in its relations with the local population or, indeed, with respect to anyone who may wish to do banking business in the broad and general sense of the term in Bermuda.

Mr. Vriesendorp told me that the plaintiff cannot use the word "bank" in its title for fear of misleading the locals. Misleading the locals into thinking what, one asks? The answer would seem to be misleading the locals into thinking that the plaintiff was a bank.

What the plaintiff achieved in Bermuda is a corporate status which endowed it with what Mr. Vriesendorp fairly refers to in his affidavit as "broad corporate powers." Under the Bermuda statute of 1970 and the schedules and regulations incorporated and set forth in this plaintiff's charter, the plaintiff could engage in a wide variety of corporate activities. Indeed, and there is

---

**9.** 78 A.D.2d 953, 433 N.Y.S.2d 519 (3rd Dept. 1980).

perhaps an enlightening irony in this, one of the very few things it could not do in Bermuda was to act as a regular bank. While it could do much else, I recognize it has chosen not to exercise these broad corporate powers; it has chosen instead to exclusively funnel its energies and its assets into mortgages upon vessels. That was certainly its right, but it does not follow, it seems to me, that the entity, the nature of the entity insofar as it exists and is perceived under the law of Bermuda, is changed.

In my view, the plaintiff is not a Bermudian bank and would not be regarded as a bank by the laws, regulations or customs or popular conceptions of Bermuda.[9A]

I have heard a good deal about the plaintiff's Dutch parent. There is a corporation which I am told and accept is organized under the Dutch banking laws.

The present plaintiff is a wholly owned subsidiary of that company. The name of the Dutch parent, in translation "Shipmortgage Bank," has its principal place of business in Rotterdam and engages in the same sort of business that its Bermudian subsidiary does. I accept, as I have said, that it is regulated by the Dutch banking authority.

It is not entitled to do anything other than what it does. Its charter and the Dutch banking laws do not permit it to do so. In that regard it differs from its Bermudian subsidiary which, as I have indicated, has broad corporate powers.

But in my view, the status of the Dutch parent under Dutch law, the extent to which the Dutch parent has its activities regulated or controlled by Dutch banking law, the characterization that Dutch law and practice would place upon the parent—it is a bank, is it not a bank?—is not relevant here. The Dutch parent did not make this loan, the Dutch parent is not a party to the underlying documents, the Dutch parent is not the plaintiff; it is the Bermudian subsidiary, a Bermudian corporation, chartered as it has been under Bermuda law and taking upon itself inevitably the character of Bermudian law with respect to what is a bank, and what is not a bank, that is the plaintiff here.

I conclude that the corporation cannot be regarded as a bank under the law of Bermuda.

But what of the law of New York, to which I now return?

Much of what I have said about the Banking Law and the *Tioga* case militates against a finding that this plaintiff should be regarded as a bank under the law of New York. However, the plaintiff urges upon me the case of *Pink v. Alden*,[10] a decision of the Second Department in 1940. It is cited to me for the general proposition that a corporation may be engaged in banking purposes even though it is authorized to and, indeed, in fact pursues non-banking objectives and activities.

At first blush the case would appear to give some support to the plaintiff, but when one considers the precise holding in the circumstances of the case, I think it does not.

In the *Pink* case, an entity known as the Westchester Title & Trust Company had gone into liquidation. It had undertaken to guaranty or, rather, to issue guaranties to certain holders of mortgages and mortgage certificates. Suit was brought against stockholders of the Westchester Title & Trust Company. Liability was asserted primarily upon a provision of the Constitution of the State of New York which imposed upon the stockholders of every corporation organized "for banking purposes" liability for the debts and liabilities of such a corporation of any kind.

---

**9A.** I have also considered the fact, testified to by Mr. Vriesendorp, that plaintiff's activities are scrutinized by an entity called the "Bermuda Monetary Authority." This authority monitors the development of Bermudian currency in relation to other currencies. A number of companies, including foreign insurance companies, are monitored by this authority. The inclusion of plaintiff within the authority's regulatory gaze does not make plaintiff a Bermudian "bank."

**10.** 260 App.Div. 564, 23 N.Y.S.2d 365 (2nd Dept.1940).

The stockholders of that particular company, seeking to avoid that liability, argued that the liability attached only to obligations which arose out of the company's activities for banking purposes and that the mortgage guaranties did not fall within that phrase.

The Court construes the language contained in the Constitution and holds that the language of the Constitution permits no such limitation nor does the language of the statute. That is a reference to a particular section of the Banking Law.

To quote from the Court's opinion, "It cannot be doubted that this was a corporation 'for banking purposes,'" taking the phrase from the Constitution. "It was empowered to and did, in fact, engage in the business of banking and its character as such was not altered by the fact that it also possessed and exercised non-banking powers. It was, therefore, a corporation of the kind described in the Constitution. The stockholders of every such corporation were declared individually responsible 'for all its debts and liabilities of every kind.' This language must be given its natural meaning." [11]

That is the holding of *Pink v. Alden*. It construes an entirely different enactment by the legislature, it construes the Constitution of the state which refers to corporations formed "for banking purposes."

The section of the Banking Law with which we are concerned, which exempts from the provisions of the Business Corporation Law entities which are banks, does not use that phrase. It does not read, as it could have: "or any corporation formed for or engaged in banking purposes." It simply exempts from the operation of the Business Corporation Law entities which are "banks." And, again, I am of the view that the statute must be given, perhaps not a strict, but certainly not a fanciful reading or interpretation.

The Business Corporation Law is an important New York statute. Provisions of another statute which exempt foreign corporations or any corporation from the provision of the Business Corporation Law must not be expanded beyond what the ordinary meaning would suggest, and I conclude in view of the circumstances to which I have referred that this particular plaintiff is not and cannot be regarded as a bank within the meaning of the pertinent New York statutes, any more than it can and should be regarded as a bank within the context of the law of Bermuda.

The next question that arises is whether the provisions of Section 1312, known in the vernacular as a "door closing" statute, are impermissible or inapplicable on the facts of this case because they bring about an impermissible interference with interstate commerce.

If that were so, then at least within the context of this case the supremacy of the Commerce Clause in the United States Constitution would prevent the applicability of the section to this case.

The plaintiff relies primarily upon *Allenberg Cotton Company v. Pittman* [12] and cases which follow that decision in the Supreme Court. It is necessary, I think, to consider the particular facts of *Allenberg*.

The plaintiff was a cotton merchant resident in Tennessee. He had entered into a contract to purchase the entire crop, the seasonal crop of cotton of a farmer who lived and grew his cotton in Mississippi. The contract contemplated that the cotton would be delivered in Mississippi to the merchant and perhaps be warehoused in Mississippi before it went on elsewhere.

The farmer did not perform. The Tennessee merchant sought to sue him in the courts of Mississippi. The Mississippi legislature had enacted a comparable door closing statute. The Supreme Court of Mississippi held that the statute operated to bar the suit in Mississippi by the Tennessee cotton merchant.

---

**11.** 260 App.Div. at 566, 23 N.Y.S.2d 365.

**12.** 419 U.S. 20, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974).

The Supreme Court reversed, holding that the practicalities of the cotton trade brought this particular transaction sufficiently within interstate commerce to deny to the Mississippi legislature the right to impose such limitations upon suits in Mississippi against Mississippi residents.

Justice Douglas referred to the contractual arrangements in suits as "representative of a course of dealing with many farmers whose cotton, once sold to a merchant, enters a long interstate pipeline which ultimately terminates at mills across the country or, indeed, around the world." 419 U.S. at 25, 95 S.Ct. at 263.

The Court said that the "delivery to the merchant and the warehousing in Mississippi are fleeting events which are an integral first step in a vast system of distribution of cotton in interstate commerce." *Id.* at 26, 95 S.Ct. at 264.

> At 419 U.S. 30, 95 S.Ct. 266 it is said: "Delivery of the cotton to a warehouse, taken in isolation, is an intrastate transaction. But that delivery is also essential for the completion of the interstate transaction, for sorting and classification in the warehouse are essential before the precise interstate destination of the cotton, whether in this country or abroad, is determined."

The Court refers to similar conclusions reached in respect of interstate dealings in wheat and in milk.

At p. 33, 95 S.Ct. at p. 267 the Court says in *Allenberg:*

> "There is no indication that the cotton which makes up appellant's 'perpetual inventory' in Mississippi is anything other than appellant has claimed it to be, namely, cotton which is awaiting necessary sorting and classification as a prerequisite to its shipment in interstate commerce."

And the Court concludes its judgment and sums up its rationale at p. 34, 95 S.Ct. at p. 267:

> "We hold only that Mississippi's refusal to honor and enforce contracts made for in-

terstate or foreign commerce is repugnant to the Commerce Clause."

In the case at bar plaintiffs seek to enforce a guaranty executed in New York and given by New York residents. *Allenberg* would apply, it seems to me, if it could fairly be said that that particular contract in suit was made for interstate or foreign commerce, or to look at somewhat different phrases used by the Court in *Allenberg,* that it was essential for the making or the completion of an interstate transaction.

The cases which follow *Allenberg* make it clear that a particular corporation may in its business have both interstate and intrastate aspects. That is the analysis of the Fifth Circuit in the *Sar Manufacturing Company* case cited by the defendants.[13]

What one looks to within the context of the Commerce Clause is, first, what aspect of the plaintiff's business is involved in the claim which underlies this suit; and, secondly, although this question is related to the first, who are the particular defendants against whom the plaintiff seeks to pursue a remedy.

The *Sar* court says:

> "The plaintiff's business has both interstate and intrastate aspects and under these circumstances it has been held in *Eli Lilly & Co.* [*v. Sav-On-Drugs,* 1961, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288] [a prior Supreme Court case,] that such state regulations governing the intrastate functions of the corporation do not violate the Commerce Clause merely because the corporation also engages in interstate commerce." [14]

That phrase "merely because" suggests, as I have just suggested, that one must look closely at the transaction. It is not sufficient for the plaintiff to say that it is engaged in interstate commerce. A further analysis must be made and that analysis necessarily includes the precise claim upon which suit is brought and the nature of the defendants sought to be sued. That latter

**13.** *Sar Manufacturing Company, Inc. v. Dumas Mfg. Co., Inc.,* 526 F.2d 1283 (5th Cir.1976).

**14.** 526 F.2d at 1285 (footnote omitted).

factor is material as appears from the *Sar* court's next to last paragraph:

"And particularly with respect to the defendants the marketing and supply functions of the plaintiff are localized enough to easily fall under the ambit of a series of transactions which are primarily intrastate and concomitantly the corporation falls under the satrapy of the qualification statutes."[15]

"Qualification statutes" is a more polite way of saying "door closing" statutes. The statute involved in the *Sar* case was exactly that sort of statute.

The plaintiff relies upon *Diversacon Industries,* a subsequent opinion in the Fifth Circuit.[16] The result reached was different, but so were the facts, as will appear from this quotation from the opinion in *Diversacon.* Unlike the *Sar* case, the Fifth Circuit in *Diversacon* refused to apply the teaching of *Eli Lilly.* It gives its reasons at p. 1034.

The Court says in *Diversacon:*

"The agreement upon which Diversacon is suing the bank is clearly the single business transaction to which all of Diversacon's activities related, the construction of the Louisiana Highway."

That does not fly in the face of nor is it inconsistent with the analysis in *Sar* that a particular corporation may have identifiable interstate and intrastate aspects of its business.

The Court of Appeals for this Circuit recognized that general principle in the matter of *Grand Bahama Petroleum Company, Ltd. v. Asiatic Petroleum Corporation.*[17] The Court says in a footnote on p. 1326:

"In *Eli Lilly & Company,* Lilly sued Sav-On-Drugs in a state court on a contract which the Court found to be entirely separable from any particular interstate sale. The application of New Jersey's door closing statutes to Lilly was upheld, a result consistent with *Allenberg,* supra, given the intrastate nature of the contract in *Eli Lilly.*"

Now, how do these principles apply to the case at bar?

It is said on behalf of plaintiff that the flow of money within the interstate, and indeed, international world of ship financing should be analogized to a commodity such as cotton or wheat or milk.

There is appeal to that argument, although it is not clear on this record that it would apply to the facts in this case. It is not clear precisely where the $1,550,000 loaned to the Phoenix Corporation came from, and one would suppose that if it came entirely from a bank account that the plaintiff maintained in New York and it was paid over in New York, even the flow of money, which is the concept that plaintiff relies upon, could be regarded as entirely intrastate.

But I do not need to take further evidence on that point or pursue the question further. What is involved here is not the flow of money, what is involved here is a suit upon a contract of guaranty. Conceptually, the money could flow wherever it comes from to wherever it is going pursuant to a ship mortgage without there being any guaranty at all.

As I stated earlier in a somewhat different context, the guaranty is a separate contract. It is entered into with separate parties. It is not essential to have a guaranty of a ship mortgage. It may be preferable for the lender. Here it clearly was. The lender may regard it as desirable. Indeed, the lender may even take the position that without the guaranty he would not have entered into the loan. There is no evidence on that point before me, but I will assume it to be true for the sake of the analysis. But that is not the same concept of necessity or essentiality, it seems to me, that the Supreme Court had in mind in *Allenberg.*

**15.** *Id.* at 1286 (footnote omitted).

**16.** *Diversacon Industries, Inc. v. National Bank of Commerce of Mississippi,* 629 F.2d 1030 (5th Cir.1980).

**17.** 550 F.2d 1320 (2d Cir.1977).

In *Allenberg,* the Supreme Court was talking about the cotton itself. There had to be cotton grown, harvested, sold, and warehoused, before the pipeline of interstate commerce in cotton could come into being. Therefore, a contract for the production, the growth, the sale and the delivery of the very commodity upon which the trade depended could fairly be regarded as so vitally and essentially and inevitably and necessarily caught up in interstate commerce that the Commerce Clause comes into play.

I do not reach that conclusion here. The plaintiff was engaged in an interstate business, I will accept that for the sake of the argument, the financing of ships flying the flags of various nations. It had open to it various security arrangements, some of which it could require, others which it did not need to require. It was quite open to the plaintiff to rely solely upon the mortgage, solely upon the assignment of freights. It chose in this case to require in addition to that a guaranty. To obtain that guaranty it dealt with residents of New York State. To negotiate for that guaranty its representatives and its attorneys dealt with the defendants and their attorneys in New York State. The guaranty was executed and delivered in New York State. Enforcement is sought in New York State. In particular, enforcement by writ of attachment is sought against real property situated in New York State. The guaranty was generated as the result of a course of conduct which I have held constitutes the doing of business in New York State by this plaintiff.

I regard the guaranty as separable and intrastate and I do not regard the Commerce Clause as applicable here, and that is because primarily in the circumstances of this case interstate commerce and its vital and essential requirements are not threatened or impacted upon by the application of the New York qualification statute in the circumstances of this case.

■ I come finally to paragraph 11 of the guaranty.[18] It is urged that that paragraph prevents the defendants from relying upon Section 1312 of the New York Business Corporation Law. The argument was cast yesterday in the terms of waiver. Perhaps a different argument could have been cast in terms of estoppel. Estoppel is an equitable remedy which sometimes imposes consequences upon people even if they did not intend or desire that those consequences should arise.

But whether the argument be cast in terms of estoppel or waiver, it seems to me that it cannot succeed in view of the public policy manifested in Section 1312 of the Business Corporation Law. That provision is there for a number of purposes. The underlying policy is discussed in the *Von Arx* case[19] referred to yesterday where the Appellate Division said:

"The purpose of Section 1312 of the Business Corporation Law and its predecessor statutory provisions is not to enable defendants to avoid contractual obligations, but to regulate such foreign corporations which are, in fact, conducting business within the state so that they shall not be doing business under more advantageous terms than those allowed a corporation of this state." 384 N.Y.S.2d at 897.

That is a perfectly legitimate public policy. It impacts upon this plaintiff in view of the holdings that I have made previously. The legislature's intent is that foreign cor-

---

18. Paragraph 11 of the guaranty reads as follows:

"Each of the Guarantors hereby agrees that any legal action or proceeding with respect to this Guarantee, or to enforce any judgment obtained against such Guarantor may be brought by the Lender in any jurisdiction where such Guarantor or any of his assets may be found or located, or in the courts of the State of New York or in the United States Federal courts in said State, or in the courts of any other appropriate jurisdiction, as the Lender may elect; and by execution and delivery of this Agreement, each of the Guarantors irrevocably submits to each such jurisdiction and service of process may be made as provided by law."

19. *Von Arx, A.G. v. C.J. Breitenstein,* 52 A.D.2d 1049, 384 N.Y.S.2d 895 (4th Dept.1976), *aff'd,* 41 N.Y.2d 958, 394 N.Y.S.2d 876, 363 N.E.2d 582 (1977).

porations not do business under more advantageous terms than those allowed a corporation of this state.

The question that then arises is whether it is open to a private party to request, insist upon or receive a contractual undertaking which would do violence to and emasculate that particular statutory provision.

I conclude that that is not possible, that the overriding policy contained in Section 1312 may not be negated by such a private contract.

As an alternative basis for this holding there is no evidence in the record that the question was specifically raised or that the defendants intended and with knowledge of this factor waived or gave up their right to make the argument which they now make, and there is authority for the proposition that waiver or even estoppel cannot arise where the party against whom waiver or estoppel is urged was entirely unaware of the underlying circumstances.[20]

These are, in short, alternate reasons for the conclusion which I reach.

■ It follows from what I have said that Section 1312 applies to this corporation because this corporation is not authorized to do business in New York, and the actions, and I refer to both actions, must be stayed.

In my view this does not work an unfair result upon the plaintiff or upon its Dutch parent. When corporations, American or European, take advantage of such opportunities as may exist offshore they must, it seems to me, bear whatever risks may arise from the laws and the jurisdictions within which they then come into contact in doing business.

The remedy for this plaintiff or for corporations similarly situated is to seek the proper authorization to do business in New York. Whether a plaintiff so situated wishes to do that within the overall context of its corporate scheme is for it to decide.

But certain risks are run that statutes such as New York has provided in the Business Corporation Law may, when viewed in the context of New York law and the law of the corporation's place of incorporation, here Bermuda, bring about certain consequences, certain requirements which had not been originally contemplated. But that these factors and requirements are present in this case I have no doubt, and it follows that there is presently lacking in this plaintiff standing to maintain either action.

In these circumstances, I make the following order:

As to 82 Civil 8588, the temporary restraining order is vacated, the motion for preliminary injunction is denied, all proceedings in the action are stayed, and the case will be placed upon the suspense calendar of this Court. Plaintiff is given 60 days within which to register and conform with the Business Corporation Law, or such further time as may be granted upon timely application and showing of good cause, failing which the action will be dismissed without prejudice.

I deny the defendants' application for costs and fees.

With respect to 82 Civil 6378, the action is stayed, the case is placed upon the suspense calendar of this Court subject to the same terms and conditions referred to in 85 Civil 8588.

It is So Ordered.

**20.** *Talbot Mills, Inc. v. Benezra,* 35 Misc.2d 924, 231 N.Y.S.2d 229 (Sup.Ct.N.Y.1962) (prior actions by defendant held not sufficient to estop defendant from asserting incapacity of foreign corporation to sue in New York where, at time of such actions, defendant had no knowledge of plaintiff's incapacity).